**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **JAVIER GINER, DAMIAN NORIEGA,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **EP-11-CV-126-KC** |
| **ESTATE OF MARTIN HIGGINS, LITHIUM NICKEL ASSET HOLDING COMPANY I & II, INC.,** | § § § § | |
| **Defendants**. | § § | |

## ORDER

On this day, the Court considered Plaintiffs Javier Giner and Damian Noriega's (collectively "Plaintiffs") Motion for Partial Summary Judgment ("Motion"), ECF No. 33, Defendants Lithium Nickel Asset Holding Company I, Inc. and Lithium Nickel Asset Holding Company II, Inc.'s (collectively "LNAH") Motion for Summary Judgment ("LNAH's Motion"), ECF No. 34, and LNAH's Motion for Determination of Foreign Law, ECF No. 36.

For the reasons stated below, the Court finds that Plaintiffs' Motion should be **GRANTED**, LNAH's Motion should be **GRANTED** in part and **DENIED** in part, and LNAH's Motion for Determination of Foreign Law should be **GRANTED**.

## I.      BACKGROUND

LNAH explains that this "case arises from a sordid tale of fraud, forgery, double-dealing and deceit, south of the Rio Grande." LNAH's Mot. ¶ 2. Although not quite as dramatic, the following are the undisputed facts unless otherwise noted.

1

Sometime in 2004, a scheme was hatched to fraudulently transfer title of a manufacturing facility in Juarez ("Facility") owned by a Mexican corporation, Sistemas de Baterias S.A. de CV ("Sistemas") to another company called Industrial Fira de Mexico ("Industrial Fira"). LNAH's Proposed Undisputed Facts Pursuant to Rule 56(c) ("LNAH's Facts") ¶¶ 9-10, 16-19, ECF No. 35. A man named Hector Fierro owned Industrial Fira. *Id.* ¶ 19. Fierro had a relationship with both Plaintiffs, employing Plaintiff Giner as an accountant, and Plaintiff Noriega as a lawyer. *See id.* ¶¶ 8, 28-29; Pls.' Resp. to LNAH's Facts ¶¶ 28-29, ECF No. 40. Both Plaintiffs are citizens of Mexico and licensed professionals in Mexico. LNAH's Facts ¶¶ 8, 28.

The exact details of the transfer scheme are not clear, but the parties agree that Plaintiff Giner participated in the scheme, and that the scheme was ultimately successful. *See id.* ¶¶ 16-17; Pls.' Resp. to LNAH's Facts ¶¶ 16-17. Moreover, the parties agree that the transfer was accomplished by creating a fictitious person named Jesus Salazar who was allegedly given the power to the sell the Facility on behalf of Sistemas. LNAH's Facts ¶¶ 17-19.

In February or March of 2005, Plaintiffs had a falling out with Fierro. *Id.* ¶¶ 31-32. Plaintiffs then had a meeting with Martin Higgins who was president of Battery Park Industries ("BPI"). *Id.* ¶¶ 12, 34. BPI owned Sistemas, which in turn, owned the Facility before it was fraudulently transferred to Industrial Fira. *See id.* ¶¶ 15-19. Plaintiffs allege that Higgins was always aware of the fraudulent scheme to transfer the Facility, but LNAH appears to dispute that Higgins was involved. *See id.* ¶¶ 16-17; Pls.' Resp. to LNAH's Facts ¶¶ 16-17. Regardless of his alleged involvement, Higgins wanted to recover the Facility for Sistemas. *See* LNAH's Facts ¶¶ 32-39. Plaintiffs agreed to assist in reacquiring the Facility for Sistemas in return for a payment of ten percent of the sale price of the Facility, payable once the Facility was sold. *Id.* ¶

37.

It is not clear exactly how the Plaintiffs reacquired the Facility, but the parties agree they were successful in reacquiring the Facility for Sistemas.  *See id.* ¶ 39.  Sistemas then immediately transferred the facility to Verlaine S. De R. L. De C.V. ("Verlaine").  *Id.* ¶ 40.  Verlaine is owned entirely by Defendant LNAH.  *Id.* ¶ 41.  Higgins was president and one of two board members of LNAH.  *See* LNAH's Resp. to Pls.' Proposed Undisputed Facts Ex. 9 ("Guthart Declaration"), ECF No. 38-11; Pls.' Resp. to LNAH's Facts 8.  In other words, this was a transfer of the Facility from one company controlled by Higgins to another company controlled by Higgins.

In April of 2005, Higgins had not yet paid Plaintiffs.  Higgins then signed a promissory note agreeing that upon a future sale of the Facility, Higgins would pay Plaintiff Giner $50,000 or 10% of the sale price, whichever was greater.  *See* LNAH's Facts ¶¶ 56-59.  Plaintiff Noriega contends that he was also promised money for helping reclaim the Facility.  Pls.' Resp. to LNAH's Facts ¶ 60.  There is evidence that the Facility was worth four or six million dollars. *See* LNAH's Facts Ex. G 38:14-24, ECF No. 35-8; Pls.' Resp. to LNAH's Facts Ex. B 171:11-21, ECF No. 40-2.

By July of 2006, the Facility had not been sold and neither Plaintiff had been paid. LNAH's Facts ¶ 64.  Upset about the lack of payment, Plaintiffs removed some equipment from the Facility.  *Id.* ¶¶ 64-65.  This shut down operations at the Facility.  *Id.* ¶¶ 66-67.

On September 16, 2006, Higgins and Plaintiffs met in the law offices of Baker & McKenzie in Juarez, Mexico.  *Id.* ¶ 69.  Higgins's lawyer, Manuel Padron of Baker & McKenzie, and Plaintiff Noriega drafted an agreement entitled "Transaction Agreement."  *See id.* ¶ 69; Mot. 3.  The parties wrote the Transaction Agreement in Spanish, but the parties have agreed to a

3

certified English translation.  LNAH's Facts ¶ 69.

Although relatively brief, the Transaction Agreement (1) provides for $300,000 in compensation to Plaintiffs for their work in reacquiring the Facility; (2) releases Plaintiffs from liability; (3) secures the return of the equipment; (4) requires Plaintiffs to deliver various documents regarding Hecmma — a company that assembled goods at the Facility; and (5) ensures that Plaintiffs will not divulge confidential information about Sistemas, Verlaine, LNAH, and a few other companies.  *See* LNAH's Mot. for Determination of Foreign Law Ex. B, English Translation, ¶¶ 3-8 ("Transaction Agreement"), ECF No. 36-3; LNAH's Facts ¶¶ 8-9.  The Transaction Agreement also states that the "contract shall be construed in accordance with the law of the United Mexican States."  Transaction Agreement ¶ 7.  Finally, attached to the Transaction Agreement is a document entitled "Non-negotiable Promissory Note" that lists the schedule of payments to Plaintiffs.  *See* LNAH's Mot. for Determination of Foreign Law Ex. Q 19,[1] ECF No. 35-18.

On March 22, 2009, Higgins died.  Pls.' Proposed Undisputed Facts ("Pls.' Facts") ¶ 8, ECF No. 33-2.  Plaintiffs allege that they never received the payment owed under the Transaction Agreement, and they initiated this lawsuit in January of 2011.  *See* Mot. 2; Notice of Removal 1, ECF No. 1.  On March 30, 2011, Defendants removed the case to this Court based on diversity jurisdiction.  Notice of Removal 2-3.  Plaintiffs bring claims against the Estate of Higgins (the "Estate") and LNAH for breach of contract and quantum meruit.  Pls.' Second Am. Compl. ¶¶ 14-16, ECF No. 26.

---

[1]     To assist the reader in finding citations in this document, the Court references the page numbers that the CM/ECF docketing system generates.

In their Motion, Plaintiffs seek summary judgment on their breach of contract claim. Mot. 1. LNAH opposes Plaintiffs' Motion and filed a motion seeking summary judgment in its favor on both the contract and quantum meruit claims. LNAH's Mot. ¶ 1. The Estate also opposes Plaintiffs' Motion, but did not file its own summary judgment motion. *See generally* Estate's Resp. to Pls.' Mot. ("Estate's Response"), ECF No. 41.

## II.     DISCUSSION

### A.     Standard

A court must enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). To show the existence of a genuine dispute, the nonmoving party must support its position with citations

5

to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited by the movant do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

The court resolves factual controversies in favor of the nonmoving party; however, factual controversies require more than "conclusory allegations," "unsubstantiated assertions," or "a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Further, when reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**B.      Quantum Meruit Claim**

As a preliminary matter, Plaintiffs do not oppose LNAH's Motion on their quantum meruit claim. Pls.' Resp. to LNAH's Mot. 1, ECF No. 39. Plaintiffs state they "have decided not to pursue their quantum meruit claim." *Id.* Therefore, LNAH's Motion is **GRANTED** in respect to the quantum meruit claim, and the quantum meruit claim is **DISMISSED**. Thus, Plaintiffs' breach of contract claim is the only remaining issue before the Court.

6

### C.      Breach of Contract Claim

Before determining the merits of the breach of contract claim, the Court must first

determine what law to apply.

### 1.      Applicable law

In its Motion for Determination of Foreign Law, Defendant LNAH argues that Mexican

law applies to Plaintiffs' breach of contract claim.  LNAH's Mot. for Determination of Foreign

Law ¶ 4.  Plaintiffs agree with LNAH that Mexican law applies.  *See* Pls.' Resp. to LNAH's Mot.

1.  In contrast, Defendant Estate appears to assert that Texas law applies.  *See generally* Estate's

Resp. (citing entirely Texas law on contracts and not analyzing the conflict of laws issue).

Because there is a disagreement on the applicable law, the Court examines the conflict of laws

rules.

### a.      Conflict of laws rules

In diversity cases, federal courts apply the substantive law of the forum state.  *Erie R.R.*

*Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Krieser v. Hobbs*, 166 F.3d 736, 739 (5th Cir. 1999).

The substantive law of the forum includes the state's conflict of laws rules.  *Hyde v.*

*Hoffmann-La Roche, Inc.*, 511 F.3d 506, 510 & n.28 (5th Cir. 2007) (citing *Klaxon Co. v. Stentor*

*Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

Here, the Court has jurisdiction based on diversity of citizenship.  And the Court sits in

Texas.  Therefore, Texas's conflict of laws rules apply.

Texas generally follows the Second Restatement of Conflict of Laws.  *See Int'l Interests,*

*L.P. v. Hardy*, 448 F.3d 303, 306-07 (5th Cir. 2006); *In re J.D. Edwards World Solutions Co.*, 87

S.W.3d 546, 549 (Tex. 2002).  Under the Second Restatement and Texas law, courts give effect

7

to contractual provisions that designate the choice of law if the law chosen by the parties has a reasonable relationship to the parties' transaction and the chosen law is not contrary to a fundamental policy of the state.  *See Int'l Interests*, 448 F.3d at 306-07; *In re J.D. Edwards*, 87 S.W.3d at 549; Restatement (Second) of Conflict of Laws § 187(2) (1971).

Here, Mexican law applies under Texas's conflict of laws rules.  First, the Transaction Agreement explicitly states that Mexican law applies.  Transaction Agreement ¶ 7.  Second, there is a reasonable relationship between the parties' transaction and the chosen law given that the parties entered into the Transaction Agreement in Mexico, the parties wrote the Transaction Agreement in Spanish, and several of the parties are citizens of Mexico.  *See* LNAH's Facts ¶¶ 8-9, 69; *Int'l Interests*, 448 F.3d at 308 (focusing on the parties' citizenship and where the parties entered into the agreement).  Moreover, the Transaction Agreement concerns the Facility located in Mexico, releases legal liability based on Mexican law, and ensures confidentiality of information regarding Mexican companies.  *See* LNAH's Facts ¶¶ 8, 68-70; Transaction Agreement ¶¶ 6, 8.  And finally, none of parties argue that Mexican contract law is contrary to a fundamental policy of Texas.  Therefore, the Court holds that Mexican law applies.

### b.    Procedural rules

To determine foreign law, a federal court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1; *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of the Republic of Venex.*, 575 F.3d 491, 498 n.8 (5th Cir. 2009).  "The court's determination must be treated as a ruling on a question of law."  Fed. R. Civ. P. 44.1.

Finally, as in any other diversity case, federal courts apply federal procedural law in cases

8

involving foreign substantive law.  *See Morris v. LTV Corp.*, 725 F.2d 1024, 1027-28, 1030-31

(5th Cir. 1984); *see also Banco de Mex. v. Orient Fisheries, Inc.*, 680 F. Supp. 2d 1132, 1137-40

(C.D. Cal. 2010) (applying Mexican substantive law under the procedural guidelines of a Rule 56

summary judgment).

### c.        Chihuahua law or Mexican federal law

There appears to have originally been a dispute over whether Chihuahua state law or

Mexican federal law applies.  LNAH's Opp'n to Pls.' Mot. ("LNAH's Opposition") ¶ 19, ECF

No. 37.  This dispute arose because Plaintiffs' expert on Mexican law originally cited Chihuahua

state law.  *Id.*; Mot. Ex. F ¶¶ 9-10, ECF No. 33-8.  However, Plaintiffs later appear to accept that

Mexican federal law applies.  *See* Reply by Pls. to LNAH's Mot. ("Pls.' Reply to LNAH") 2-3,

ECF No. 44.  Thus, the Court examines whether Chihuahua state law or Mexican federal law

applies.

Mexican law provides that commercial contracts are governed by federal and not state

law.  *See* Stephen Zamora et al., *Mexican Law* 510 & n.21, (2005).  Contracts are usually

commercial when the purpose of the contract is business or between parties engaged in business.

*See* Código de Comercio [CCo.] [Federal Commercial Code], art. 75 (Mex.);[2] Rona R. Mears*,*

*Contracting in Mexico: A Legal and Practical Guide to Negotiating and Drafting*, 24 St. Mary's

L.J. 737, 742-43 (1993); LNAH's Mot. for Determination of Foreign Law Ex. A ("LNAH's

Expert") ¶ 2.4, ECF No. 36-2; *see also* Zamora, *surpa*, at 510 n.21 ("A contract is considered

commercial in nature if it is carried out for the purpose of making a profit.").

---

[2]        LNAH provided English translations of the relevant provision of the Federal
Commerical Code.  LNAH's Mot. for Determination of Foreign Law Ex. A, Ex.
3, ECF No. 36-2.

Here, the Transaction Agreement is commercial in nature because the parties were businesses and businessmen, and the purposes of the Transaction Agreement were commercial — i.e. compensation for securing the return of the commercial Facility, delivery of various documents regarding the Hecmma business, and confidentiality of information about the various businesses. *See* Transaction Agreement ¶¶ 3-5, 8. Therefore, the Court holds that Mexican federal law applies to the Transaction Agreement.

### 2. Validity of the contract

Both Defendants contest the validity of the Transaction Agreement. LNAH's Opp'n ¶¶ 29-30; Estate's Resp. ¶ 4. First, both LNAH and the Estate argue the Transaction Agreement is invalid based on duress. LNAH's Opp'n ¶ 30; Estate's Resp. ¶¶ 14-16. Second, the Estate argues that the Transaction Agreement is invalid because there was no consideration. Estate's Resp. ¶¶ 17-18. Finally, LNAH argues that Higgins did not have authority to bind LNAH. LNAH's Opp'n ¶ 29. Plaintiffs respond that the defenses of duress, lack of consideration, and lack of authority all fail under Mexican law. Pls.' Reply to LNAH 1-2; Reply by Pls. to Estate ("Pls.' Reply to Estate") 2-3, ECF No. 45. After examining some general principles of Mexican contract law, the Court examines each defense.

### a. Mexican contract law

In contrast to the United States and its common law heritage, Mexico's legal system is based on the civil law tradition. *See* Jorge A. Vargas, *Mexican Law for the American Lawyer* 23-24 (2009); Jorge A. Vargas, *Mexican Law and Personal Injury Cases: An Increasingly Prominent Area for U.S. Legal Practitioners and Judges*, 8 San Diego Int'l L.J. 475, 485-87 (2007) [hereinafter "Mexican Law & Personal Injury"]. Accordingly, Mexico has "five basic

codes that sustain the legal system."  Vargas, *Mexican Law for the American Lawyer*, *supra*, at 23.  Two of those codes, the Federal Civil Code and the Commercial Code, generally govern contracts.  *See* Vargas, *Mexican Law for the American Lawyer, supra,* at 139; 1 Jorge A. Vargas, *Mexican Law: A Treatise for Legal Practitioners and International Investors* § 28.1 (1998) [hereinafter "Treatise"].  The provisions Federal Civil Code are the most general.  *See* Zamora, *supra*, at 510.  Under the Mexican legal system, more specific statutes and codes, like the Commercial Code, override the Federal Civil Code.  *Id.* at 509-10.  For example, commercial contracts are first subject to the more specific rules of the Mexican Commercial Code (Código de Comercio), and then the Federal Civil Code acts "as supplemental rules to the extent that a matter is not dealt with in the Commercial Code."  *Id.* at 510.

Under Mexican law, the elements of a binding contract are (1) consent and (2) an object which can be the subject-matter of the contract.  Código Civil Federal [CC] [Federal Civil Code], art. 1794 (Mex.);[3] *Vargas, Mexican Law for the American Lawyer, supra*, at 140.  Failure to perform a valid contract gives rise to civil liability.  Zamora, *supra*, at 508.

### b.    Duress

Both LNAH and the Estate argue that Higgins signed the Transaction Agreement under duress, and therefore the Transaction Agreement is unenforceable.  LNAH's Opp'n ¶ 30; Estate's Resp. ¶¶ 14-16.  Specifically, Defendants allege that Plaintiffs took equipment from the Facility, and then held the equipment ransom until Higgins agreed to pay Plaintiffs $300,000.  Estate's Resp. ¶¶ 14-16; LNAH's Facts ¶¶ 64-67.  Plaintiffs respond that these alleged facts do not

---

[3]     Citations to the Mexican Civil Code are made pursuant to translations in Jorge A. Vargas, *Mexico Civil Code Annotated* (2009).

amount to duress under Mexican law because Defendants only allege economic duress and not physical violence.  Pls.'s Reply to Estate 2; Pl.'s Reply to Estate, Ex. A ("Pls.' Expert") ¶ 4, ECF No. 45.

Article 1812 states that "consent is invalid if . . . obtained by violence, or duress."  CC, art. 1812.  Article 1819 explains "[t]here is duress or threat of violence if physical force or threats may result in the loss of life, the good name and reputation, freedom, health or a considerable amount of assets of the contracting party."  CC, art. 1819.

 Unfortunately LNAH provides no information on how Mexican law treats the defense of duress, and the Estate only references Texas law on duress.  *See* LNAH's Opp'n ¶ 30; Estate's Resp. ¶¶ 12-16.  Plaintiffs do provide some information.  Plaintiffs' expert on Mexican law states that duress "is much more than economic duress, but requires 'violence or intimidation' to induce someone to sign a contract."  Pls.' Expert ¶ 4.  However, this interpretation appears contrary to the specific words of the Federal Civil Code that defines duress to include the threat or loss of "a considerable amount of assets of the contracting party."  CC, art. 1819.

The Court need not decide this issue because even if Mexican law allows a defense of economic duress, Defendants have failed to produce evidence of duress that would vitiate consent under Mexican law.[4]  First, neither Defendant provides evidence that the withholding of

---

[4]     None of parties provided information on the treatment of burdens of proof under Mexican law.  However, Plaintiffs and LNAH appear to assume that Defendants have the burden to prove affirmative defenses.  *See* LNAH's Opp'n ¶ 9; Pls.' Reply to LNAH 1-2.  The Estate did not address the issue under Mexican law.

The Mexican legal system does not appear to place as much emphasis on burdens of proof as the American common law system.  *See* Robert M. Kossick, Jr., *Litigation in the United States and Mexico: A Comparative Overview*, 31 U. Miami Inter-Am. L. Rev. 23, 64-65 (2000).  This is not surprising because litigation in the Mexican legal system is less party driven.  *See id.*  Instead, "Mexican judges have broad authority to manage the collection, introduction,

the equipment constituted a "considerable amount of assets of the contracting party."  *See* CC, art. 1819.  The Estate does suggest that the removal of the equipment forced Higgins to shut down the Facility's operations.  Estate's Resp. ¶ 14.  But the Estate provides no evidence of how long the Facility was shut down or what this cost Higgins or his affiliated companies.  Without any indication of the cost, or its relation to the Higgins's income and the overall revenue of the affiliated companies, Defendants have presented no evidence to show that removing the equipment created a loss or threat of a loss of "a considerable amount."  *See* CC, art. 1819.

Second, it is undisputed that Higgins signed the Transaction Agreement while being represented by a lawyer from the international law firm of Baker & McKenzie.  *See* LNAH's Facts ¶ 71; Estate's Resp. ¶ 5; Mot. 3.  This suggests a lack of duress because Higgins had advice of counsel when signing the Transaction Agreement.  *See* Pls.' Expert ¶ 5 (explaining, but without citation to authority, that a party represented by an attorney cannot claim duress under Mexican law).  Further, this lawyer presumably would have advised Higgins to not sign the Transaction Agreement under duress.

Third, the Transaction Agreement was notarized.  *See generally* LNAH's Mot. for

---

and qualification of information."  *Id.* at 64.  "Articles 278 and 279 of the [Code of Civil Procedure] . . . grant a judge the freedom to do whatever he or she feels is necessary to secure the best proof and know the truth regarding the controverted facts."  *Id.*

Although there appears to be less emphasis on burdens of proof, "Mexico's fundamental principle of Civil Procedure Law, which governs the burden of proof states: 'He/she who has an interest in affirming a fact shall have the burden to prove it.'"  Jorge A. Vargas, *Mexican Legal Dictionary* § B770 (2009), *available at* an updated database (Mexican Legal Dictionary (MEXDICT)) at http://www.westlaw.com.  Therefore, the Court holds that for purposes of this Order, the Defendants have the burden to prove affirmative defenses because both parties appear to have assumed the burden is on the Defendants, and the Court's own research suggests that assumption is warranted.

13

Determination of Foreign Law Ex. B, Spanish Translation, ¶¶ 3-8 ("Original Spanish Version"), ECF No. 36-3 (containing a notary seal on each page of the original Spanish version).  This is significant under Mexican law because notarization makes contracts presumptively valid.  *See* Vargas, Treatise, *supra*, §§ 1.22, 3.12.  Notaries in Mexico are "highly competent attorneys" who act as "authenticators of legal acts."  Vargas, *Mexican Law for the American Lawyer*, *supra*, at 176; *see* Vargas, Treatise, *supra*, § 1.22.  "In Mexico, . . . the public notary (Notario Público) is the most respected member of the legal profession."  Vargas, Treatise, *supra*, § 1.22.  Beyond just the presumption of validity, the process of notarizing the contract gave Higgins an opportunity to seek further advice regarding the agreement and even to expose the alleged wrongful conduct to the notary who is a public official.  *See id.*

Finally, the Estate argues that there was no reason for Higgins to agree to pay Plaintiffs $300,000 except that his equipment was being held for ransom.  Estate's Resp. ¶ 15.  But the Transaction Agreement gave Higgins and his companies benefits beyond just the return of the equipment — namely, a confidentiality agreement and a promise to deliver documents. Transaction Agreement ¶¶ 5, 8.  It is highly unlikely that a party under duress would be able to obtain extra concessions when the threat was allegedly so significant it vitiated the party's free will.  Further, Higgins had a prior obligation to compensate Plaintiffs ten percent of the sale price when the Facility was sold.  *See* Estate's Resp. ¶¶ 2, 17-18; LNAH's Facts ¶¶ 37, 56-59, 70. Thus, there was a legitimate reason for the $300,000 payment to Plaintiffs; that is, to satisfy an outstanding debt between Higgins and Plaintiffs.

In conclusion, Defendants have failed to provide evidence of duress as defined by Mexican law.  Therefore, the Court holds that Defendants' duress defense fails as a matter of

law.

### c.      Consideration

The Estate next argues that the Transaction Agreement is invalid because there was no

consideration.  Estate's Resp. ¶¶ 17-18.  Plaintiffs respond that Mexican contract law does not

require consideration.  Pls.' Reply to Estate 3-4.

As stated above, the only elements of a binding contract under Mexican law are (1)

consent and (2) an object which can be the subject-matter of the contract.  CC, art. 1794; *Vargas,*

*Mexican Law for the American Lawyer, supra,* at 140.  Mexican law does not require

consideration.  Zamora, *supra*, at 512 (citing CC, arts. 2243-47) ("In Mexico there is no

[consideration] requirement.  Thus, a contract to promise to sell property is binding, even if the

promisee has not offered anything in return.").  Therefore, the Court holds that the Estate's

defense based on lack of consideration fails as a matter of law.

### d.      Authority

LNAH argues in one sentence that Higgins lacked authority to bind LNAH in the

Transaction Agreement.  LNAH's Opp'n ¶ 29.  LNAH's lone support for this contention is an

affidavit by the Chairman of the Board of Directors of LNAH.  *See id.*  The Chairman states that

Higgins was never given authority to obligate LNAH to pay anyone.  Guthart Decl. ¶ 3.

Plaintiffs respond that under Mexican law, Higgins had the requisite authority because Higgins

was the only other board member and the President of LNAH.  Pls.' Reply to LNAH 1-2.

Mexican law recognizes three forms of general powers of attorney: (1) general power of

attorney for litigation and collections; (2) general power of attorney for acts of administration;

and (3) general power of attorney for acts of ownership.  Vargas, Treatise, *supra*, § 3.22; *see also*

*Banco de Mexico*, 680 F. Supp. 2d at 1137-38 (citing Vargas, Treatise, *supra*, § 3.22).  To enter into a contract on behalf of LNAH, Higgins needed the "general power of attorney for acts of administration."  *See* Vargas, Treatise, *supra*, § 3.24.  That general power includes the authority to conduct a principal's day-to-day business and to enter into contracts in the ordinary course of business.  Vargas, Treatise, *supra*, § 3.24.

Here, LNAH has failed to produce evidence of a lack of authority that would vitiate consent under Mexican law.  First, as stated above, the Transaction Agreement was notarized, and thus presumptively valid under Mexican law.  *See* Vargas, Treatise, *supra*, §§ 1.22, 3.12; *see generally* Original Spanish Version.  Second, LNAH's only evidence that Higgins lacked authority is the Chairman's conclusory affidavit.  *See* LNAH's Opp'n ¶ 29.  In his affidavit, the Chairman cites no bylaws, rules of corporate governance, or any other facts suggesting Higgins lacked authority to enter into contracts on behalf of LNAH.  *See* Guthart Decl. ¶ 3.  Because this affidavit does not contain factual assertions and is conclusory, it fails to create a fact issue.  *See C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co. of Hartford*, No. 10–30950, 2011 WL 5031414, *3 (5th Cir. Oct. 24, 2011); *Little*, 37 F.3d at 1075 (holding that "conclusory allegations," "unsubstantiated assertions," or  "a 'scintilla' of evidence" are not enough to defeat a motion for summary judgment).  Third, the Transaction Agreement secured benefits for LNAH.  *See* Transaction Agreement ¶¶ 4-5, 8.  For example, the Transaction Agreement provided that Plaintiffs must not disclose LNAH's confidential information.  *See id.* ¶ 8.  The fact that Higgins was securing benefits for LNAH suggests he had the power to enter into a contract on behalf LNAH because LNAH has not repudiated any of those benefits.  In sum, LNAH has failed to meet its burden to present evidence that Higgins lacked authority to bind LNAH in the

16

Transaction Agreement.

### e.    Conclusion

In conclusion, the Court holds that the defenses of duress, lack of consideration, and lack of authority all fail under Mexican law.  The Court accordingly turns to the remaining question — how to interpret the Transaction Agreement to determine whether Plaintiffs are entitled to recovery.

### 3.    Interpreting the Transaction Agreement

Plaintiffs and LNAH both argue that the plain language of the Transaction Agreement warrants summary judgment in their favor.[5]  *See* Mot. 7-8; LNAH's Mot. ¶¶ 18-21.  Plaintiffs argue that the Transaction Agreement binds both Higgins and LNAH to pay Plaintiffs $300,000.  Mot. 7-8.  In contrast, LNAH argues that the Transaction Agreement is clear that LNAH is not obligated to pay Plaintiffs.  LNAH's Mot. ¶¶ 18-21.[6]

The disputed provisions of the Transaction Agreement are the following:

TRANSACTION AGREEMENT

That is executed by Mr. MARTIN PATRICK HIGGINS personally and as Legal representative of the corporations known as SISTEMAS DE BATERIAS, S.A. DE C.V., VERLAINE S. DE R.L. DE C.V., MEXICO INDUSTRIAL SERVICES II, INC., MEXICO SMT SERVICES II, INC., LITHIUM NICKEL ASSET HOLDING COMPANY I, INC. and LITHIUM NICKEL ASSET HOLDING

---

[5]    Both LNAH and Plaintiffs appear to assume that interpreting a contract is a legal question to be decided by the Court on summary judgment.  *See* LNAH's Mot. ¶ 3; Mot. 6.  This assumption appears warranted because Mexican courts generally do not have jury trials.  *See* Kossick, *supra*, at 41, 64-66.  Therefore, the Court holds that for purposes of this Order, interpreting a contract is a legal issue to be decided by the Court.

[6]    The Estate solely focused on its duress and consideration arguments, and did not raise any arguments about how to interpret the language of the Transaction Agreement.  *See generally* Estate's Resp.

17

COMPANY II, LLC as well as Mr. JAVIER GINER MENDOZA personally and as a Member of the Council of Managers of the corporation known as EMPRESAS DE MANUFACTURA AVANZADA S. DE R.L. DE C.V., and as legal attorney-in-fact for the corporations known as SISTEMAS DE BATERIAS, S.A. DE C.V., VERLAINE S. DE R.L. DE C.V. and EMPRESAS DE MANUFACTURA AVANZADA S. DE R.L. DE C.V., and lastly Mr. DAMIAN NORIEGA GINER, Atty., personally and as a Member of the Council of Managers of the corporation known as EMPRESAS DE MANUFACTURA AVANZADA S. DE R.L. DE C.V., and as legal attorney-in-fact for the corporation [sic] known as SISTEMAS DE BATERIAS, S.A. DE C.V. and EMPRESAS DE MANUFACTURA AVANZADA S. DE R.L. DE C.V., and each and every one of them appeared voluntarily and there was no deceit or bad faith among them, and they conditioned this transaction according to the following clauses:[7]

. . . .

THIRD.  Mr. MARTIN PATRICK HIGGINS recognizes that he has a debt owed to Mr. JAVIER GINER MENDOZA and Mr. DAMIAN NORIEGA GINER, Atty. and this debt consist of the amount of $300,000.00 (THREE HUNDRED THOUSAND DOLLARS) . . . .  The DEBT must be paid once Mr. MARTIN PATRICK HIGGINS has received payment from VERDE REALTY OPERATING PARTNERSHIP, L.P. for the price for the sale of the building owned by VERLAINE . . . .  However, in the event that such sales contract fails to be executed by December 31, 2006 at the latest, Mr. MARTIN PATRICK HIGGINS agrees to pay Mr. JAVIER GINER MENDOZA and Mr. DAMIAN NORIEGA GINER US$10,000.00 dollars weekly . . . starting as of December 31, 2006 until the DEBT becomes settled in its entirety.

. . . .

By virtue of what is stated foregoing, the parties are signing this agreement in acceptance, which shall become fully effective starting as of the 19th day of September, 2006.

(illegible signature)
MR. MARTIN PATRICK HIGGINS
PERSONALLY AND AS LEGAL REPRESENTATIVE OF
SISTEMAS DE BATERIAS, S.A. DE C.V., VERLAINE S. DE R.L. DE C.V.,

---

[7]   This opening paragraph is known as a "preamble."  *See Vargas, Mexican Law for the American Lawyer, supra*, at 149.  According to Professor Vargas, "[u]nder Mexican law and practices, the preamble identifies the parties (whether companies or individuals), who are entering into the contract."  *Id.*

MEXICO INDUSTRIAL SERVICES II, INC., MEXICO SMT SERVICES II, INC.,
LITHIUM NICKEL ASSET HOLDING COMPANY I, INC., and LITHIUM NICKEL
ASSET HOLDING COMPANY II, LLC.

(illegible signature)
MR. JAVIER GINER MENDOZA
PERSONALLY AND AS A MEMBER OF THE COUNCIL OF.
MANAGERS OF THE CORPORATION KNOWN AS
EMPRESAS DE MANUFACTURA AVANZADA S. DE R.L. DE C.V.,
AND AS LEGAL ATTORNEY-IN-FACT FOR THE CORPORATIONS
KNOWN AS SISTEMAS DE BATERIAS, S.A. DE C.V.,
VERLAINE S. DE R.L. DE C.V. and EMPRESAS DE MANUFACTURA
AVANZADA S. DE R.L. DE C.V.

*DAMIAN NORIEGA GINER*
(illegible signature)
DAMIAN NORIEGA GINER, ATTY.
PERSONALLY AND AS A MEMBER OF THE COUNCIL OF
MANAGERS OF THE CORPORATION KNOWN AS
EMPRESAS DE MANUFACTURA AVANZADA S. DE R.L. DE C.V.,
AND AS LEGAL ATIORNEY-IN-FACT FOR THE CORPORATIONS
KNOWN AS SISTEMAS OE BATERIAS, S.A. DE C.V. and
EMPRESAS DE MANUFACTURA AVANZADA S. DE R.L. DE C.V.

Transaction Agreement ¶¶ preamble, 3, signatures.

LNAH argues that the third paragraph explicitly states that "HIGGINS recognizes that he

has a debt owed to . . . GINER . . . and . . . NORIEGA."  LNAH's Mot. ¶¶ 18-21; Transaction

Agreement ¶ 3.  And it does not state that LNAH owes a debt to Plaintiffs.  LNAH's Mot. ¶¶ 18-

21; Transaction Agreement ¶ 3.  Moreover, LNAH correctly points out that the attached schedule

of payments labeled as a promissory note only mentions Higgins, and not any of the companies.

LNAH's Mot. ¶ 21.  Thus, LNAH argues that while Higgins is personally obligated to pay

Plaintiffs, LNAH has no obligation to pay Plaintiffs.  LNAH's Mot. ¶¶ 18-21.  Plaintiffs respond

that the Court must read the preamble and the third paragraph together.  Pls.' Reply to LNAH 3-

4.  Read together, Plaintiffs argue that Higgins signed on behalf of himself and several entities

19

including LNAH, and thus all are jointly liable for the debt.  *Id.*  To resolve this dispute, the

Court first examines the applicable Mexican law.

Mexican law has several broad principles for interpreting contracts.  The parties'

intentions are a critical concern.  *See* CC, arts. 1851-53.  Article 1851 states "[i]f the terms of a

contract are clear and unequivocal on the intentions of the parties, it shall be adhered to literally."

CC, art. 1851.  However, if the contract's words contradict the parties' intentions, the parties'

intentions should prevail.  *Id.*

If a contract is subject to conflicting interpretations, "they shall be interpreted in a manner

most appropriate to give it the intended effect."  CC, art. 1853.  "The clauses of a contract shall

be interpreted together so that clauses of dubious meaning are clarified by the interpretation of

the complete document."  CC, art. 1854.

In addition to these general propositions of contract law, there are specific rules for

settlement agreements.  Mexican law defines a settlement or compromise as a "contract whereby

parties extend to each other mutual concessions and thereby terminate an existing controversy or

avoid a future one."  CC, art. 2944.  Article 2962 states that a "compromise must be strictly

construed and its clauses are indivisible, unless the parties agree otherwise."  CC, art. 2962.

Applying these principles, the Court holds that the Transaction Agreement makes both

Higgins and LNAH liable for the $300,000 owed to Plaintiffs.  This reading of the Transaction

Agreement better comports with a dominant concern of Mexican contract law — the parties'

intentions.  *See* CC, arts. 1851-54.  Moreover, this interpretation provides the most holistic

reading of the Transaction Agreement.  *See* CC, art. 1854.

The parties' intentions are apparent from the terms of the Transaction Agreement.  First,

both the preamble and the signature section suggest that the parties intended for Higgins to bind himself and LNAH to pay Plaintiffs the $300,000.  *See* Transaction Agreement ¶¶ preamble, signatures.  Both sections state explicitly that Higgins signed "PERSONALLY AND AS LEGAL REPRESENTATIVE OF" the various companies, including LNAH.  *Id.*

Second, the benefits and burdens of the Transaction Agreement suggest that the parties intended for both Higgins and LNAH to be liable to Plaintiffs.  The Transaction Agreement provides that Plaintiffs receive $300,000 and a liability release in exchange for (1) Plaintiffs' work in reacquiring the Facility, (2) the return of equipment, (3) the delivery of documents related to the Facility, and (4) a promise that Plaintiffs will not divulge confidential information about the various companies.  Transaction Agreement ¶¶ 3-8.  LNAH's reading of the Transaction Agreement that Higgins alone is liable appears contrary to the parties' intentions because under that reading, Higgins would have the burden to pay Plaintiffs the $300,000 even though all four benefits of the Transaction Agreement primarily run to the companies and not Higgins personally.  The reacquisition of the Facility did not result in Higgins owning the Facility — LNAH gained ownership of the Facility through its subsidiary, Verlaine.  *See* LNAH's Facts ¶¶ 39-41.  Similarly, Plaintiffs were obligated to return equipment that was owned by a company operating at the Facility, not Higgins.  *See id.* ¶¶ 64-67.  Likewise, the delivery of documents about Hecmma likely benefitted LNAH and not Higgins personally because those documents related to a business operating at Verlaine and LNAH's Facility.  *See id.* ¶¶ 8-9; Transaction Agreement ¶¶ 4-5.  And finally, the information that Plaintiffs promised to keep confidential was information about LNAH and the other companies.  Transaction Agreement ¶ 8.

It is true that Higgins likely benefitted personally from the Transaction Agreement

21

because he was the president of LNAH and was affiliated with the various companies.  *See* Pls.'
Resp. to LNAH's Facts 8; Estate's Resp. ¶¶ 10, 15.  However, that suggests that both Higgins
and the companies should be liable for the $300,000 because they all benefitted under the
Transaction Agreement.[8]

Reading the preamble and the third paragraph together also comports with general
practices of contracting under Mexican law.  Professor Vargas explains that unlike many
contracts drafted by American lawyers, Mexican lawyers typically include a preamble in the
contract that "identifies the parties (whether companies or individuals), who are entering into the
contract."  Vargas, *Mexican Law for the American Lawyer*, *supra*, at 149.  The preamble serves
the critical purpose of specifying the party's "role in the contract."  *See id.*  Here, the Transaction
Agreement's preamble clearly states that Higgins's "role" is both as an individual and as a
representative of LNAH and the other companies.  *See* Transaction Agreement ¶ preamble.  This
suggests that Higgins bound both LNAH and himself to pay Plaintiffs the $300,000 because his
"role" was both as an individual and as a representative of LNAH.

LNAH responds that because Article 2962 states that a "compromise must be strictly
construed," the Court should interpret the third paragraph literally and without reference to the
preamble, *i.e.* Higgins personally owes a debt to Plaintiffs.  LNAH's Mot. ¶¶ 18-21; LNAH's

---

[8]     Higgins's deposition testimony may also suggest the parties intended for LNAH
and the other companies to be bound.  Higgins was asked "did you believe
LNAH, Verlaine, Sistemas, BPI, were all again responsible for making that
payment?"  Mot. Ex. E ("Higgins's Dep.") 73:21-24, ECF No. 33-7.  Higgins
answered: "Yes."  *Id.* 75:25.  However, this testimony is somewhat ambiguous
because it is not clear whether Higgins was discussing the 2005 promissory note,
the Transaction Agreement, or the schedule of payments promissory note
attached to the Transaction Agreement.  *See* LNAH's Opp'n ¶ 28.  Thus, the
Court does not rely on this testimony.

Expert ¶ 4.5-4.7.  A settlement or compromise is a "contract whereby parties extend to each other mutual concessions and thereby terminate an existing controversy or avoid a future one."  CC, art. 2944.  Here, it is clear that the Transaction Agreement is a settlement or compromise agreement because the parties made "mutual concessions" to terminate an existing controversy — namely, Plaintiffs were released from liability in exchange for the return of the equipment, the delivery of various documents, and a promise to maintain confidentiality.  *See* CC, art. 2944; Transaction Agreement ¶¶ 3-8.  Thus, LNAH is correct that Article 2962 applies, and the Court must strictly construe the Transaction Agreement.  *See* CC, art. 2962.

However, Articles 2962 and 1854 dictate that the preamble and the third paragraph shall be read together and harmonized.  In addition to requiring a strict construction, Article 2962 mandates that a settlement agreement's "clauses are indivisible."  *Id.*  Moreover, the Court must read the agreement as a whole to clarify any "clauses of dubious meaning."  CC, art. 1854.

Reading the third paragraph without reference to the preamble would make the preamble's statement that Higgins was signing the Transaction Agreement on behalf of LNAH meaningless, and thus "divisible."  *See* CC, art. 2962.  The preamble states that Higgins is signing on behalf of himself and various companies, including LNAH.  *See* Transaction Agreement ¶ preamble.  Thereafter, the Transaction Agreement never mentions LNAH except in the signature section and the provision about confidentiality.  *See generally* Transaction Agreement.  The signature section states that Higgins signs personally and as a legal representative of LNAH and the other companies.  Transaction Agreement ¶ signatures.  And the confidentiality provision is unrelated to whether Higgins signed on behalf of LNAH  — the provision simply states that Plaintiffs will not disclose confidential information about LNAH and

23

the other companies.  *See id.* ¶ 8.  To give the preamble, and Higgins's signing on behalf of

LNAH, some purpose as required by Articles 1854 and 2962, the Court cannot adopt Plaintiff's

reading of the Transaction Agreement.  *See* CC, arts. 2962, 1854.

LNAH suggests that "the intent of Parties is not relevant . . . because the relevant law

provides that the Transaction Agreement must be strictly construed."  LNAH's Opp'n ¶ 28.  But

this characterization of Mexican law is contradicted by the plain language of the Civil Code that

makes the parties' intentions a paramount concern.  *See* CC, arts. 1851-53.

LNAH's final argument is the most persuasive — that it is "nonsensical" to read

Higgins's name as always obligating the various companies.  LNAH's Reply ¶ 14, ECF No. 43.

According to LNAH, "[t]o follow plaintiffs' arguments to their illogical conclusion, we would

have to assume that the Transaction Agreement requires Mr. Higgins <u>and</u> <u>Verlaine</u> to pay money

to Mr. Giner <u>and</u> <u>Verlaine</u>."  *Id.*  This results because both Higgins and Giner signed on behalf of

Verlaine according to the preamble.  Transaction Agreement ¶ preamble.

The Court agrees this reading is nonsensical.  But reading Higgins's name to include

LNAH does not suffer from the same problem.  Neither of the Plaintiffs signed on behalf of

LNAH.  *See id.* ¶ preamble.  Moreover, the Court is hard pressed to find a perfectly consistent

reading of the Transaction Agreement.  Under LNAH's reading, as discussed above, the

preamble and the signature section serve no purpose, and all the benefits accorded in the

Transaction Agreement primarily run to the companies without any of the burden following.  In

contrast, under Plaintiffs' reading, the preamble has a purpose — it ensures the individuals and

the various companies are bound by the terms of the Transaction Agreement.  And obligating the

individuals and the various companies would have made sense to both sides of the deal.  On one

side, Higgins likely intended for Plaintiffs and their respective companies to be bound to turn

over the documents and the equipment to ensure their return, regardless of which entity had

control.  On the other side of the deal, Plaintiffs likely intended for Higgins and the companies to

be bound to ensure one of the entities had sufficient funds to pay Plaintiffs.  *See id.* ¶ preamble.

In sum, reading the Transaction Agreement to bind LNAH to pay Plaintiffs harmonizes the

different provisions of the Transaction Agreement and best reflects the parties' intentions.

Finally, none of the parties dispute that Higgins is personally liable to Plaintiffs.  Reading

the third paragraph alone clearly makes Higgins liable — "HIGGINS recognizes that he has a

debt owed to . . . GINER . . . and . . . NORIEGA."  *Id.* ¶ 3.  And reading the preamble and the

third paragraph together ensures Higgins is personally liable because the preamble states that

Higgins executes the contract "personally."  *Id.* ¶ preamble.

In conclusion, the Court holds that under Mexican law, the Transaction Agreement makes

both Higgins and LNAH liable for the $300,000 owed to Plaintiffs.

## III.    CONCLUSION

For the reasons stated above, Plaintiffs' Motion, ECF No. 33, is **GRANTED**.

LNAH's Motion, ECF No. 34, is **GRANTED** in part and **DENIED** in part.  LNAH's

Motion is **GRANTED** with respect to the quantum meruit claim.  LNAH's Motion is **DENIED**

with respect to the breach of contract claim.  LNAH's Motion for Determination of Foreign Law,

ECF No. 36, is also **GRANTED**.

Finally, Plaintiffs have requested attorneys' fees but have not briefed the issue.  Mot. 8.

Accordingly, **IT IS FURTHER ORDERED** that Plaintiffs file a Motion seeking attorneys' fees

with citations to the applicable law showing that their entitlement to such fees <u>on or before</u>

25

<u>February 13, 2012</u>.

**SO ORDERED**.

**SIGNED** on this 13th day of January, 2012.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE